IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR F 08-0140 LJO |
| Plaintiff, | **DECISION ON APPEAL OF DENIAL OF MOTION TO SUPPRESS** (Doc. 19.) |
| vs. | |
| RICARDO FRAIRE, | |
| Defendant. / | |

**INTRODUCTION**

Defendant RICARDO Fraire ("Mr. Fraire") seeks reversal of denial of his motion to suppress evidence resulting in his plea of guilty to driving with an alcohol level more than .08 percent in violation of 36 C.F.R. § 4.23 and arising from his stop at a vehicle checkpoint for wildlife poaching. For the reasons discussed below, this Court AFFIRMS denial of Mr. Fraire's motion to suppress.

**BACKGROUND**

**Poaching Checkpoint**

In 2007, the National Park Service ("Park Service") identified several poaching cases during prior years in Sequoia-Kings Canyon National Park ("Park") and decided to employ a vehicle checkpoint. The checkpoint was set up pursuant to the Park Service's Reference Manual ("RM-9") on law enforcement policy. Park Service staff contacted other national parks with checkpoint operations and developed operating procedures.

The Park Service set up a checkpoint on California Highway 180 at the picnic area of the Park's Big Stump entrance station. Signs approaching the checkpoint advised motorists "prepare to stop" and "stop ahead." Traffic cones were set up, and a Park Service Law Enforcement Ranger in a reflective jacket directed traffic.

The checkpoint was to mitigate hunting in the Park, which is prohibited as a public safety concern. The checkpoint further served to educate Park entrants about area hunting regulations although the hunting prohibition was clearly posted in the Park and prevalently known by hunters. The Park Service hoped to catch poachers and to deter potential violators.

The checkpoint did not sign the reason to stop and stopped all inbound and outbound traffic for 15-60 seconds. At the checkpoint, motorists were asked only if they had been hunting and there were no attempts to search vehicle trunks. If a person had not been hunting, the stop could be as brief as 10-15 seconds. If a person admitted to hunting, a Park ranger checked his/her license, game tag, and permitted the person to proceed. A motorist could legally transport game through the Park if the game had been taken outside the Park. No dogs or other methods were used to check for hidden wildlife carcasses.

Mr. Fraire points to the absence of evidence of successful poacher prosecutions arising from the Park checkpoint and the absence of data of persons stopped at the checkpoint and successful poaching arrests from checkpoints in the United States.

**Mr. Fraire's Arrest**

On October 13, 2007, Mr. Fraire's vehicle stopped at the checkpoint,[1] and National Park Law Enforcement Ranger Ernesto Felix ("Ranger Felix") approached Mr. Fraire's vehicle and asked if Mr. Fraire had been hunting. During his interaction with Mr. Fraire, Ranger Felix smelled a strong odor of alcoholic beverage on Mr. Fraire's breath and observed Mr. Fraire's bloodshot, glassy eyes. Mr. Fraire admitted that he had drank a few beers.

Ranger Felix conducted field sobriety tests, which Mr. Fraire performed poorly and demonstrated 10 signs of intoxication. Ranger Felix determined Mr. Fraire was under the influence of alcohol or

---

[1] The parties fail to indicate whether Mr. Fraire was entering or about to exit the Park.

drugs. After Mr. Fraire consented to a search, Ranger Felix found several open alcohol containers a quarter full on the rear floor behind the driver's seat. Mr. Fraire submitted to a breath alcohol test which revealed his .14 percent blood alcohol level. Ranger Felix arrested Mr. Fraire for driving under the influence of alcohol (36 C.F.R. § 4.23(a)(1)) and DUI blood alcohol greater than .08 percent (36 C.F.R. § 4.23(a)(2)).

### Mr. Fraire's Motion To Suppress

A January 11, 2008 information charged Mr. Fraire with Count One – operating a vehicle under the influence of alcohol (36 C.F.R. § 4.23(a)(1)), Count Two – driving while under the influence of alcohol with a blood alcohol level in excess of .08 percent (36 C.F.R. § 4.23(a)(3)), and Count Three – possession of an open container of alcohol in a motor vehicle (36 C.F.R. § 4.14(b)). On February 6, 2008, Mr. Fraire filed his motion to suppress evidence gathered at the checkpoint in that his stop was not supported by reasonable suspicion of Mr. Fraire's criminal activity and the checkpoint detention was illegal. After a March 27, 2008 hearing and oral argument, U.S. Magistrate Judge Gary Austin ("Judge Austin") denied Mr. Faire's motion to suppress.

Mr. Fraire executed an April 24, 2008 Memorandum of Conditional Plea Agreement to plead guilty to Count Two – driving while under the influence of alcohol with a blood alcohol level in excess of .08 percent (36 C.F.R. § 4.23(a)(3)). Mr. Fraire reserved his right to appeal denial of his motion to suppress. After an April 28, 2004 judgment, Mr. Fraire filed this appeal of Judge Austin's denial of the motion to suppress. Mr. Fraire challenges Judge Austin's ruling that the Park checkpoint was legal despite stopping Mr. Fraire's vehicle "without individualized suspicion" and the absence of evidence of the gravity of poaching or the checkpoint's effectiveness. The United States of America ("Government") contends the checkpoint was lawful to defend Mr. Fraire's stop and evidence obtained at the stop.

### DISCUSSION

### Standard Of Review

Denial of a motion to suppress is reviewed de novo. *United States v. Faulkner*, 450 F.3d 466, 469 (9th Cir. 2006). Factual findings underlying denial of a motion to suppress are reviewed for clear error. *Faulkner*, 450 F.3d at 469.

**Individualized Suspicion**

A Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481 (1990). "[T]o accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure. . . . But the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560-561, 96 S.Ct. 3074 (1976).

Mr. Fraire argues that the Park checkpoint violated the Fourth Amendment because the checkpoint "was not conducted under any recognized limited exceptional circumstance." Mr. Fraire advocates that individualized suspicion of criminality is required to search and seize:

> The Fourth Amendment requires that searches and seizures be reasonable. A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. *Chandler v. Miller*, 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). While such suspicion is not an "irreducible" component of reasonableness, *Martinez-Fuerte*, 428 U.S., at 561, 96 S.Ct. 3074, we have recognized only limited circumstances in which the usual rule does not apply. For example, we have upheld certain regimes of suspicionless searches where the program was designed to serve "special needs, beyond the normal need for law enforcement." *See, e.g., Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (random drug testing of student-athletes); *Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (drug tests for United States Customs Service employees seeking transfer or promotion to certain positions); *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations). We have also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited. *See, e.g., New York v. Burger*, 482 U.S. 691, 702-704, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (warrantless administrative inspection of premises of "closely regulated" business); *Michigan v. Tyler*, 436 U.S. 499, 507-509, 511-512, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (administrative inspection of fire-damaged premises to determine cause of blaze); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 534-539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (administrative inspection to ensure compliance with city housing code).
>
> We have also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, *Martinez-Fuerte, supra*, and at a sobriety checkpoint aimed at removing drunk drivers from the road, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In addition, in *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), we suggested that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible. In none of these cases, however, did we indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing.

*City of Indianapolis v. Edmond*, 531 U.S. 32, 37-38, 121 S.Ct. 447 (1997) (drug interdiction checkpoints where police officers demanded driver's licenses and registrations, peered into windows and led drug-

sniffing dogs around vehicles violated Fourth Amendment).

Mr. Fraire distinguishes the *Edmond* checkpoint program with that at issue in *Sitz*, 496 U.S. 444, 110 S.Ct. 2481, which addressed highway sobriety checkpoints involving brief, suspicionless stops so police officers could detect intoxication and remove drivers from the road. In *Sitz*, motorists who exhibited signs of intoxication were diverted for a license and registration check and, if warranted, further sobriety tests. In *Edmond*, 531 U.S. at 39, 121 S.Ct. 447, the U.S. Supreme Court explained the *Sitz* checkpoint program:

> This checkpoint program was clearly aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue. The gravity of the drunk driving problem and the magnitude of the State's interest in getting drunk drivers off the road weighed heavily in our determination that the program was constitutional.

The Government argues that the checkpoint's "special law enforcement concern" (poaching) entitled Ranger Felix to stop Mr. Fraire "without individualized suspicion." The Government points to *Illinois v. Lidster*, 540 U.S. 419, 423, 124 S.Ct. 885 (2004), where the U.S. Supreme Court held that the Fourth Amendment forbids stops without individualized suspicion for general "crime control" purposes "in the absence of special circumstances." The fact that a vehicle stops "normally lack individualized suspicion cannot by itself determine the constitutional outcome" in that the "Fourth Amendment does not treat a motorist's car has his castle" and "special law enforcement concerns will sometimes justify highway stops without individualized suspicion." *Lidster*, 540 U.S. at 424, 124 S.Ct. 885. The "practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use." *Martinez-Fuerte*, 428 U.S. at 561, n. 14, 96 S.Ct. 3074. A person's "expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectations of privacy." *Martinez-Fuerte*, 428 U.S. at 561, 96 S.Ct. 3074 (border patrol stops for illegal aliens "may be made in the absence of any individualized suspicion at reasonably located checkpoints").

Mr. Fraire appears to contend that the Park checkpoint is per se illegal as a general crime control device. However, the record reflects the Park Service's special law enforcement concerns to protect Park wildlife and visitors, to mitigate poaching and to educate on prohibition of Park hunting. Although

Mr. Fraire questions the Park Service's motives, nothing suggests that they are less than legitimate. As such, the focus turns to the checkpoint's reasonableness.

### **Reasonableness**

Factors to judge a checkpoint's reasonableness include:

1. Whether the checkpoint was selected pursuant to guidelines and a uniformed officer stops all vehicles, *see Sitz*, 496 U.S. 444, 453, 110 S.Ct. 2481; and

2. The "gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty," *Lidster*, 540 U.S. at 427, 124 S.Ct. 885, *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637 (1979).

To support the Park checkpoint's reasonableness, the Government notes that the checkpoint was established pursuant to the RM-9, the Park Service's law enforcement manual, and Park Service authority under 16 U.S.C. § 42 and 36 C.F.R. § 2.2. The Government points out that uniformed Park Rangers performed all stops. The Government argues that the gravity of the public concern is great to deter and catch illegal hunters, to protect visitors and wildlife from forbidden hunting, and to ensure wildlife is hunted "in the proper time, place and manner." The Government points to minimal interference with individual liberty outweighed by the public interest to deter and prohibit Park hunting.

The parties do not dispute that the Park checkpoint was appropriately created under proper authority and, using Mr. Fraire's words, "supervisory level officials." There is no dispute that uniformed officers stopped all vehicles at the checkpoint. Mr. Fraire attempts to trivialize the gravity of the checkpoint's public concerns by claiming that the checkpoint "was designed to stop tourists and ask them to confess to the crime of hunting in the park" given that Park hunting is illegal to render "impossible" the regulatory checkpoint purpose. Mr. Fraire fails to challenge meaningfully the checkpoint purposes to protect Park wildlife, to deter Park hunting, to catch violators and to educate the public. The Park was established for public enjoyment of its resources, including its wildlife free of hunting. Moreover, Mr. Fraire takes no issue with length or scope of the checkpoint stop and related

/ / /

/ / /

Park Ranger conduct.[2]  As such, Mr. Fraire does not raise an issue as to the severity of the checkpoint's interference.

### Checkpoint Effectiveness

Mr. Fraire further notes that to support a checkpoint program's constitutionality, the U.S. Supreme Court considers success of detecting checkpoint targets:

> Unlike *Prouse*, this case involves neither a complete absence of empirical data nor a challenge to random highway stops. During the operation of the Saginaw County checkpoint, the detention of the 126 vehicles that entered the checkpoint resulted in the arrest of two drunken drivers. Stated as a percentage, approximately 1.6 percent of the drivers passing through the checkpoint were arrested for alcohol impairment. In addition, an expert witness testified at the trial that experience in other States demonstrated that, on the whole, sobriety checkpoints resulted in drunken driving arrests of around 1 percent of all motorists stopped. 170 Mich.App., at 441, 429 N.W.2d, at 183. By way of comparison, the record from one of the consolidated cases in *Martinez-Fuerte* showed that in the associated checkpoint, illegal aliens were found in only 0.12 percent of the vehicles passing through the checkpoint. See 428 U.S., at 554, 96 S.Ct., at 3081. The ratio of illegal aliens detected to vehicles stopped (considering that on occasion two or more illegal aliens were found in a single vehicle) was approximately 0.5 percent. *See ibid.* We concluded that this "record . . . provides a rather complete picture of the effectiveness of the San Clemente checkpoint," *ibid.*, and we sustained its constitutionality. We see no justification for a different conclusion here.

*Sitz*, 496 U.S. at 454-455, 110 S.Ct. 2481.

Mr. Fraire also points to marginal effectiveness of spot checks.  Mr. Fraire relies on *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979), where a police officer stopped a vehicle only to check the driver's license and vehicle's registration in the absence of observed traffic or equipment violations or suspicious activity.  In *Prouse*, 440 U.S. at 659-660, 99 S.Ct. 1391, the U.S. Supreme Court noted that the "foremost method" to enforce traffic and safety regulations is "acting upon observed violations":

> Absent some empirical data to the contrary, it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event than finding an unlicensed driver by choosing randomly from the entire universe of drivers. If this were not so, licensing of drivers would hardly be an effective means of promoting roadway safety. It seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed. The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best.

In *Prouse*, 440 U.S. at 661, 99 S.Ct. 1391, the U.S. Supreme Court further elaborated:

---

[2]  In his reply papers, Mr. Fraire states that he "does not dispute that the manner in which the checkpoint was conducted was such that it would be a valid checkpoint if conducted for a proper programmatic purpose."

> The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure – limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable – at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry v. Ohio*, 392 U.S., at 22, 88 S.Ct., at 1880. By hypothesis, stopping apparently safe drivers is necessary only because the danger presented by some drivers is not observable at the time of the stop. When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations – or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered – we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

Mr. Fraire contends that the U.S. Supreme Court upholds "checkpoints only where the Government showed an unusually grave problem and proved that police had no other means of solving the specific enforcement problem." Mr. Fraire faults the absence of evidence of a "grave threat to public safety" and a "dangerous and intractable problem" of poaching in the Park, especially given that hunting is allowed in areas directly outside the Park and "a checkpoint would be completely ineffective at proving hunting occurred in the park." Mr. Fraire further discredits the Park checkpoint procedure for only asking drivers if they hunted given that poachers "could easily lie" and that listening for gunfire is a better means to ascertain hunting in the Park.

Although Mr. Fraire raises logical concerns, the checkpoint's legitimacy is not measured simply by the number of apprehended poachers. There is no dispute that the Park Service set up the checkpoint after the Park Service had identified several poaching cases from prior years. In addition to catching violators, checkpoint purposes included deterrence, education and in turn wildlife protection. A low number of poacher apprehensions does not transform the checkpoint into a general crime control device under the circumstances of a national park open to general public. Moreover, the Park checkpoint is neither congruous nor analogous to the vehicle spot checks involved in *Prouse*.

/ / /

/ / /

/ / /

**CONCLUSION AND ORDER**

For the reasons discussed above, this Court AFFIRMS the denial of Mr. Fraire's motion to suppress.

IT IS SO ORDERED.

**Dated:   October 8, 2008**              /s/ Lawrence J. O'Neill
                                          UNITED STATES DISTRICT JUDGE